IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CV-399-FL

PHYLLIS SMITH,                              )
                                            )
            Plaintiff/Claimant,             )
                                            )
                                            )        **MEMORANDUM AND**
            v.                              )        **RECOMMENDATION**
                                            )
MICHAEL J. ASTRUE, Commissioner of          )
Social Security,                            )
                                            )
            Defendant.                      )

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-46, DE-48] pursuant to Fed. R. Civ. P. 12(c). Claimant Phyllis Smith ("Claimant") filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the denial of her application for a period of disability and Disability Insurance Benefits ("DIB"). Claimant responded [DE-50] to Defendant's motion and the time for filing a reply has expired. Accordingly, the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, this court recommends denying Claimant's Motion for Judgment on the Pleadings, granting Defendant's Motion for Judgment on the Pleadings and upholding the final decision of the Commissioner.

## STATEMENT OF THE CASE

Claimant filed an application for a period of disability and DIB on 5 February 2007, alleging disability beginning 22 January 2007. (R. 9). Her claim was denied initially and upon reconsideration. *Id.* A hearing before the Administrative Law Judge ("ALJ") was held on 31 August 2009, at which Claimant was represented by counsel and a vocational expert ("VE") appeared and

testified. (R. 18-49). On 16 October 2009, the ALJ issued a decision denying Claimant's request for benefits. (R. 6-17). On 28 July 2010, the Appeals Council denied Claimant's request for review. (R. 1-3). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

2

## DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(2)).

In this case, Claimant alleges the following errors by the ALJ: (1) failure to classify Claimant's cardiac impairment as a severe impairment; and (2) improper analysis of whether Claimant's impairments meet or equal a listed impairment. Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings at 7-9. ("Pl.'s Mem.").

# FACTUAL HISTORY

## I. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 11). Next, the ALJ determined Claimant had the following severe impairments: degenerative disc disease ("DDD"), carpal tunnel syndrome, diabetes mellitus, hypertension, asthma, chronic obstructive pulmonary disease and obesity. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[1] with alternating between sitting and standing. (R. 14). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 14). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of her past relevant work. (R. 15). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. *Id.*

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

## II. Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 44 years old and unemployed. (R. 22). Claimant is a high school graduate. (R. 22). Claimant testified that her past work experience includes medical office assistance and seamstress. (R. 23).

Claimant testified that she is unable to work due to heart problems, diabetes, hypertension, asthma and pain associated with her neck and back, which radiates to her legs, shoulders and buttocks. (R. 26-28, 30-31). Claimant's treatment for her neck and back pain have been limited to over-the-counter medication and chiropractic care; however, she has received no treatment for her carpal tunnel syndrome and does not wear a brace. (R. 27-28, 31). Symptoms experienced by Claimant as a result of diabetes and hypertension include blurred vision, headaches and dizziness. (R. 28, 40). Claimant's treating physician encouraged Claimant to exercise in order to control her diabetes; however, Claimant testified she cannot exercise due to back pain. (R. 28-29). Claimant relies on an inhaler for her asthma. (R. 30). Claimant experiences chest pain two to three times a week, which generally occurs when she walks. (R. 31, 42). Claimant testified that she has no insurance and is unable to afford medical treatment. (R. 35, 39-41). The side effects of Claimant's medication include sleepiness and drowsiness. (R. 25).

Claimant testified that she can walk about five minutes, stand 2-3 minutes and sit for up to 8 minutes before experiencing pain. (R. 32-33). Claimant testified that carrying a small laundry basket filled with clothes causes pain in her back and that at times, she cannot carry a pitcher of water due to left-handed weakness. (R. 34). Claimant's household chores are limited to washing dishes, doing laundry and vacuuming, mopping and sweeping with breaks in between. (R. 32-34). Claimant attends church on a weekly basis and sometimes attends church revivals during the week.

5

(R. 34). Claimant drives approximately two times a week. (R. 22). Claimant visits her brother approximately three times a week; however, her brother picks up Claimant and takes her home. (R. 36-37). Claimant visits the grocery store once a week. (R. 44). Claimant testified to laying down up to three hours at a time sporadically throughout the day. (R. 35, 43).

### III.    Vocational Expert's Testimony at the Administrative Hearing

Julie Sawyer-Little testified as a VE at the administrative hearing. (R. 45-50). After the VE's testimony regarding Claimant's past work experience (R. 45), the ALJ asked the VE to assume a hypothetical individual of the same age and prior work experience as Claimant with a high school education and posed three hypothetical questions. First, the ALJ asked whether jobs existed assuming the individual had the physical capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, needed to alternate between sitting and to avoid constant use of the hands and excessive dust, fumes, gases and similar pulmonary irritants. (R. 46). The VE responded that the individual could not perform Claimant's past relevant work due to the sit/stand option but could perform the following positions: cashier (DOT #211.462-010), office helper (DOT #239.567-010) and photocopying machine operator (DOT #207.685-014). (R. 46). Second, the ALJ asked whether the hypothetical individual could perform the above positions if the individual was limited to simple, repetitive and routine tasks, to which the VE responded in the affirmative. (R. 47). Finally, the ALJ asked whether any positions would be available if the individual could walk less than five minutes, stand two to three minutes, sit for six to eight minutes, has difficulty picking up a pitcher of water and takes a nap for a couple of hours during the day, to which the VE responded in the negative. (R. 47). In response to questioning from Claimant's counsel, the VE testified that no jobs would be available if the hypothetical individual would only be able to leave the home three days a week. (R.

6

48). The VE testified that she was not aware of any conflict between her testimony and the DOT and explained further that while the DOT does not address a sit/stand option, her testimony as to that limitation was based on her experience. *Id.*

## DISCUSSION

### I. The ALJ's failure to classify Claimant's cardiac impairment as a severe impairment is not reversible error.

Claimant argues that the ALJ erred in the second step of the sequential evaluation process because he "made no mention of heart problems." Pl.'s Mem. at 8. In particular, Claimant contends the ALJ "made no mention of [a July 2007 report indicating] her severe left ventricular dysfunction and accompanying fatigue and shortness of breath," "wrongly found [Claimant's] cardiac catheterization was normal in July of 2007, despite the presence of severely reduced ejection fraction of only 20%," and "made no mention of her inability to perform more than 5 MET's [i.e., metabolic equivalent of task] during her diagnostic exercise test in May of 2007 due to shortness of breath and fatigue." *Id.*; (R. 365, 395).

At the second step of the sequential evaluation process, the ALJ must determine if the claimant has one or more severe medically determinable impairments. 20 C.F.R. § 404.1520(a)(4)(ii). However, if an ALJ fails to consider whether a specific impairment is severe at step two of the sequential evaluation, it is not necessarily reversible error. In particular, as long as a claimant has any severe impairment or combination of impairments, the ALJ must proceed beyond step two and consider all of the impairments (including non-severe impairments) at the remaining steps of the sequential evaluation process, which in this case, was done. *See Jones v. Astrue*, No. 5:07-CV-452-FL, 2009 U.S. Dist. LEXIS 13893, at *6, 2009 WL 455414, at *2 (E.D.N.C. Feb. 23,

7

2009) (finding no reversible error where an ALJ does not consider whether an impairment is severe at step two of the sequential evaluation provided the ALJ considers that impairment in subsequent steps); *see also Pittman v. Astrue*, No. 5:08-CV-83-FL, 2008 U.S. Dist. LEXIS 80618, 2008 WL 4594574, *4 (E.D.N.C. Oct. 10, 2008) (holding the ALJ's failure to set forth a specific finding as to the severity or non-severity of claimant's back impairment at step two was not reversible error since ALJ considered all of the claimant's impairments in formulating claimant's RFC).

Turning to the specific records relied on by Claimant, the court observes first that with respect to the May 2007 report, Claimant essentially faults the ALJ for failing to discuss explicitly all evidence contained in that record. While the regulations require the ALJ to consider all evidence in the record when making a disability determination, *see* 20 C.F.R. § 404.1520(a)(3), the ALJ is not required to discuss with specificity all evidence in the record in reaching his decision. *See e.g., Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"); *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762 n.10 (4th Cir. 1999) (ALJ need not discuss every piece of evidence in making credibility determination); *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) (noting "a written evaluation of every piece of testimony and submitted evidence is not required"). Rather, the ALJ must "provide [this court] with sufficient reasoning for determining that the proper legal analysis has been conducted." *Keeton v. Dept. of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994); *see also Coffman*, 829 F.2d at 517. Here, the ALJ's summary of Claimant's medical record "enable[s] . . . [this court] to conclude that [the ALJ] considered her medical condition as a whole." *Dyer*, 395 F.3d at 1211. In particular, the ALJ specifically acknowledged Claimant's May 2007 hospitalization at Immanuel St. Joseph's Hospital "after experiencing chest pain" and that Claimant

was "evaluated and assessed as having acute coronary syndrome, diabetes mellitus and hypertension." (R. 12, 337).

Second, despite Claimant's contention to the contrary, the ALJ specifically acknowledged and properly summarized the 13 July 2007 cardiac catheterization report. (R. 12, 395-96). In particular, the ALJ recounted verbatim the results of the catheterization, which revealed "[e]ssentially normal coronary arteries" and "[l]eft ventricular hypertrophy, *normal* systolic function." (R. 12, 396) (emphasis added). Claimant's argument is actually centered on an alleged typographical error. In particular, Claimant dismisses the physician's description of her systolic function as "normal," contending "[a]n ejection fraction below 55% is defined as abnormal and below 30% is considered serious." Pl.'s Resp. at 2 (citing *Goldman & Ausiello*, Cecil's Textbook of Medicine 2232 (22nd ed. 2004)); *see* Dorland's Illustrated Medical Dictionary 660 (28th ed. 1994) (defining ejection fraction as "the proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole . . . [and is] often expressed as a percentage. It is normally 65 ± 8 percent; *lower values indicate ventricular dysfunction*") (emphasis added). Defendant responds only that the "ejection fraction 20%" notation "was not associated with systolic failure, but, rather, normal systolic functioning." Def.'s Mem. Supp. Def.'s Mot. J. Pleadings at 12 ("Def.'s Mem.").

While Claimant's interpretation of the July 2007 cardiac catheterization report has merit, this court finds the ALJ nevertheless properly summarized the treating physician's findings. Furthermore, to the extent the ALJ should have realized a typographical error existed, the court notes the lack of evidence in the record indicating Claimant's "heart problems" in fact affect Claimant's ability to work and Claimant cites none. In particular, despite the cardiac catheterization findings, the treating physician nevertheless "strongly advised [Claimant] to get in some sort of structured exercise

9

program and lose some weight which will help her in the long run." (R. 395). Thus, Claimant's argument that the ALJ simply failed to consider her "heart problems" in formulating Claimant's RFC without further elaboration is not persuasive. Pl.'s Mem. at 9; *see Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (explaining "[t]he mere diagnosis . . . says nothing about the severity of the condition"); S.S.R. 96-8p, 1996 SSR LEXIS 5, at *8, 1996 WL 374184, at *3 ("[W]hen there is no allegation of a . . . limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.); *Humphrey v. Barnhart*, No. 1:02-CV-32-T, 2002 U.S. Dist. LEXIS 16659, at *7, 2002 WL 31129679, *3 (W.D.N.C. Aug. 29, 2002) ("The ALJ is obligated to consider only those limitations or restrictions which are alleged and/or based upon relevant evidence."); *Wimberly v. Barnhart*, 128 Fed. Appx. 861, 864 (3d Cir. 2005) ("The duty to evaluate a claimant's symptoms imposed by 20 C.F.R. 404.1529(c) does not extend to guessing what the impact of those symptoms may be. Rather, 20 C.F.R. 404.1512(c) and 20 C.F.R. 404.1545(a)(3) explicitly impose on the claimant the burden of furnishing evidence supporting the existence of a condition and the effect of that condition on the claimant's ability to work on a sustained basis."); *Bell v. Chater*, No. 95-1089, 1995 U.S. App. LEXIS 14322, at *12, 1995 WL 347142, at *4 (4th Cir. Jun. 9, 1995) ("Although the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, . . . .[the ALJ] is not required to function as the claimant's substitute counsel . . . .") (citing *Clark v. Shalala*, 28 F.3d 828, 830-831 (8th Cir. 1994)) (internal citations and quotations omitted). Ultimately, Claimant carries the burden of establishing a prima facie entitlement to benefits and bears the risk of nonpersuasion. *Id.* (internal citations and quotations omitted); *see also* 20 C.F.R.

10

§ 404.1512(c) ("[Claimant] must provide evidence . . . showing how the impairment(s) affects . . . functioning . . . ."). Accordingly, having failed to carry her burden, Claimant's argument as to this issue is without merit.

## II. The ALJ's step three finding is supported by substantial evidence.

Claimant argues that the ALJ "improperly evaluated [Claimant's] impairments against" Listing 1.04 (disorders of the spine) and Listing 4.02 (chronic heart failure). Pl.'s Mem. at 12-13.

To be disabled under the listings, the claimant may present evidence either that the impairment meets or is "medically equivalent" to a listed impairment. *See Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir.1986); *see also* 20 C.F.R. § 404.1526. "For a claimant to qualify for benefits by showing that his . . . combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (emphasis in original). "The [ALJ] . . . is responsible for deciding . . . whether a listing is met or equaled." S.S.R. 96-6p, 1996 SSR LEXIS 3, at *7-8, 1996 WL 374180, at *3. In order to determine whether a medical impairment equals a listing, the ALJ is bound to "consider all evidence in [claimant's] case record about [the] impairment(s) and its effects on [claimant] that is relevant to this finding . . . . [The ALJ] also consider[s] the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 404.1526(c).

## A. Listing 1.04

Listing 1.04 refers generally to disorders of the spine, such as spinal stenosis, osteoarthritis and degenerative disc disease, resulting in the compromise of a nerve root or the spinal cord. *See* C.F.R. § 404, Subpt. P., App. 1, § 1.04. Under Listing 1.04A, the relevant subsection here, a

claimant must produce evidence of nerve root compression characterized by the following clinical findings: (1) neuro-anatomic distribution of pain, (2) limitation of motion of the spine, (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss; and, (4) if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). *Id.* § 1.04A.

In making his step-three finding, the ALJ found the medical evidence did not support a finding that Claimant's DDD met Listing 1.04 criteria because "[t]here is no evidence that the claimant has experienced any disorder of the spine resulting in compromise of a nerve root or spinal cord with evidence of any nerve root compression characterized by neuro-anatomical distribution of pain, limitation of motion of the spine or motor loss accompanied by sensory or reflex loss." (R. 13). While acknowledging a February 2009 MRI reveals evidence of nerve root compression, Defendant contends the remaining criteria (neuro-anatomic distribution of pain, limitation of motion of the spine and motor loss accompanied by sensory or reflex loss)[2] are unmet. Def.'s Mem. at 10; (R. 471). The court need not consider whether Claimant has presented evidence of neuro-anatomic distribution of pain or limitation of motion of the spine – two issues specifically discussed by Claimant and disputed by Defendant[3] – as the evidence does not support a finding of motor loss

---

[2] As Claimant's nerve root compression does not involve the lower back, she need not submit evidence of a positive straight-leg raising test. *See* C.F.R. § 404, Subpt. P., App. 1, § 1.04A.

[3] With respect to evidence of neuro-anatomic distribution of pain, Claimant points to an August 2004 treatment record which, according to Claimant, documents "upper back pain (around the thoracic spine) and chest pain (which corresponds to the nerve distribution)." Pl.'s Mem. at 8; (R. 256). Defendant argues, however, that distribution of such pain with respect to a T1-T2 nerve compression "is at the interior of the upper arm and upper chest. While Claimant complained of back pain, that is [] not the specific area of neuro-anatomic distribution contemplated by the listings." Def.'s Mem. at 10. In her response, Claimant argues to the contrary, contending she has "suffered from wrap around chest pain since August 2004 [] which corresponds to the dermatomal distribution

accompanied by sensory or reflex loss. As the ALJ discussed, physical examinations performed by both David A. Konanc, M.D., of Raleigh Neurology Associates, and Mohammad Hossain, M.D., of Raleigh Neurosurgical Clinic, demonstrate normal muscle tone, intact sensation and 5/5 strength in the upper and lower extremities (R. 12-13, 405, 531). Claimant does not cite evidence to the contrary, and in fact, does not discuss the criteria of motor loss accompanied by sensory or reflex loss. Based on the above, the ALJ's conclusion that Claimant's back impairment does not meet Listing 1.04 is supported by substantial evidence.

B.     Listing 4.02

The parties dispute whether the ALJ should have found Claimant disabled pursuant to Listing 4.02 (chronic heart failure). In considering Claimant's cardiovascular impairment, and in particular, hypertension, the ALJ found "there is no indication that the medical severity of this condition meets or equals the criteria described in section 4.03 [i.e., hypertensive cardiovascular disease] of the Listings. There is no evidence of any chronic heart failure, ischemic heart disease, loss of vision, impairment of renal function, or central nervous system vascular accident." (R. 13). The ALJ did not consider any other listings, including Listing 4.02. While not discussed by the parties, the court observes initially that Listing 4.03 was removed from the listings in 2006 and thus was improperly

_____

for T1-T2 which is underneath the arm and around the front of the chest." Pl.'s Resp. at 1. In support of this argument, Claimant cites, in addition to the August 2004 report mentioned above, the following evidence: (1) a 11 May 2007 emergency room report indicating chest pain "located in the central chest and left chest area and radiating" into her left shoulder and arm (R. 329, 332); (2) a 29 February 2008 "chiropractic registration and history" form indicating treatment for fibromyalgia (R. 417); (3) progress notes by Mohammad Hossain, M.D., of Allcare Internal Medicine & Pediatrics, dated 20 February 2009 and 4 March 2009, documenting Claimant's complaints of upper, lower and mid back pain (R. 462, 465); and (4) a 6 April 2009 treatment record by Russell R. Margraf, Ph.D., of Raleigh Neurological Clinic, Inc., documenting Claimant's complaint of a burning sensation between the shoulder blades and pain in her lower back (R. 530). *Id.*

13

considered by the ALJ. *See* Revised Medical Criteria for Evaluating Cardiovascular Impairments, 71 Fed. Reg. 2312, 2318 (Jan. 13, 2006) (explaining Listing 4.03 was deleted as a reference listing because it is redundant to other listings found in the general listing category for cardiovascular impairments).

Listing 4.02 requires medically documented evidence of either (1) systolic failure with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or (2) diastolic failure with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure). C.F.R. § 404, Subpt. P., App. 1, § 4.02A. Second, the systolic or diastolic failure must result in one of the following:

1.  Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC [i.e., medical consultant]. . . has concluded that the performance of an exercise test would present a significant risk to the individual; or

2.  Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period [], with evidence of fluid retention [] from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more separated by periods of stabilization []; or

3.  Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

    a.  Dyspnea, fatigue, palpitations, or chest discomfort; or
    b.  Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or
    c.  Decrease of 10 mm Hg or more in systolic pressure below the

14

baseline systolic pressure or the preceding systolic pressure measure during exercise [] due to left ventricular dysfunction, despite an increase in workload; or

    d.    Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

C.F.R. § 404, Subpt. P., App. 1, § 4.02.

As for part A of the listing, Claimant contends the July 2007 cardiac catheterization report, not taken during cardiac distress, satisfies evidence of systolic failure with an ejection fraction of 20%. Pl.'s Mem. at 9; (R. 395-96). As discussed earlier, while Defendant relies on an interpretation of this evidence contrary to that of Claimant, Claimant's argument has merit. Defendant also relies on the following: (1) a July 2004 myocardial perfusion imaging indicating a "normal left ventricular systolic function with [an] ejection fraction of 63%" (R. 400); and (2) a 11 May 2007 echocardiography report indicating "[n]ormal left ventricular systolic function. Calculated left ventricular ejection fraction: 66%." *See* Def.'s Mem. at 12; (R. 400). While this earlier evidence indicates that the "A" criteria of Listing 4.02 is not met, Claimant's position as to the July 2007 report – the most recent evidence regarding Claimant's cardiac impairment – indicates otherwise. Nevertheless, the court finds Claimant fails to satisfy the "B" criteria of Listing 4.02.

As to the "B" criteria, Claimant argues that the July 2007 systolic failure resulted in her inability to perform an exercise tolerance test. In support of this argument, Claimant relies not on the July 2007 report, but rather the results of a May 2007 diagnostic test where Claimant only "achieved 5.0 METS" due to "dyspnea" (i.e., shortness of breath) and "leg distress." Pl.'s Mem. at 9. However, as noted above, the May 2007 echocardiography report does not indicate systolic failure, and in fact, indicates an ejection fraction of 66%. Claimant points to no evidence indicating the July 2007 systolic failure resulted in an inability to perform an exercise tolerance test.

15

Accordingly, Claimant has failed to meet her burden in establishing the requirements under Listing 4.02; thus, the ALJ did not err in failing to consider Listing 4.02.

## CONCLUSION

For the reasons stated above, this court RECOMMENDS Claimant's Motion for Judgment on the Pleadings [DE-46] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-48] be GRANTED and the final decision of the Commissioner be UPHELD.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This, the 16th day of August, 2011.

Robert B. Jones, Jr.
United States Magistrate Judge